UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
2004 MAR 30 P 12: 33
U.S. DISTRICT COURT
BRIDGEPORT, CONN

EASTERN EQUIPMENT SALES, INC., :
:
:
v.                              :   3:01cv00350(AHN)
:
CASE CORPORATION.               :
:

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Eastern Equipment Sales, Inc., ("Eastern"), a distributor of construction equipment, brings this diversity action against Case Corporation ("Case") alleging a breach of the Connecticut Franchise Act, Conn. Gen. Stat. § 42-133e, the covenant of good faith and fair dealing, Conn. Gen. Stat. § 42a-1-203, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b. Pending before the court is Case's motion for summary judgment on all three counts of Eastern's complaint. For the reasons set forth below, Case's motion [dkt. # 40.] is GRANTED.

### FACTS

Viewed in the light most favorable to the plaintiff, the court makes the following factual findings based on the evidence before it. Eastern is a Massachusetts corporation with a principal place of business in Berlin, Connecticut. It sells, rents, and services construction equipment. Case is a Delaware corporation engaged in the manufacture of construction equipment. Its principal place of business is in Racine, Wisconsin.

Case uses authorized dealers in designated geographical territories to market and service its products. Pursuant to written agreements dated May 2, 1991, and August 24, 1992, (collectively the "Dealer Agreement"), Eastern was an authorized dealer with territories in Connecticut, Rhode Island, and South Easton, Massachusetts. It was the only full-line Case dealer in those areas. Eastern also distributed products manufactured by Kobelco, Kawasaki, Bomag, Allied, and Screen-All.

Although Eastern made significant capital and labor investments to develop its business as a Case dealer, problems in the relationship arose. Principally, Case was not satisfied with Eastern's sales performance and level of commitment to its products. From 1997 to 1999, Case and Eastern met on a number of occasions and exchanged a multitude of correspondence to resolve the matter, but to no avail.

The relationship was further strained by three other events. First, in May 1999, Eastern sold a piece of Case equipment, a 95XT skid steer, that Case contends Eastern was not authorized to sell. Then, in August 1999, Case discovered that a warranty specialist at Eastern had back-dated four warranty service repair claims on Case products. Finally, in October 1999, in order to receive sales credit, Eastern listed a false Massachusetts delivery address on both the invoice and warranty slips for the sale of fifteen pieces of Case equipment to a Chicago, Illinois company.

In February 2000, Case gave Eastern written notice that their Dealer Agreement would terminate on June 5, 2000. In March 2001, plaintiff commenced this action, seeking compensatory and punitive damages.

## STANDARD

Summary judgment will be granted if the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if the record, taken as a whole, could lead a reasonable trier of fact to find in favor of the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and all ambiguities and inferences that may reasonably be drawn from the facts must be viewed in the light most favorable to the nonmoving party, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

Where, as here, the nonmovant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing to an absence of evidence to support an essential element of the nonmovant's case. See Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 270 (2d Cir. 1999) (citing cases).

DISCUSSION

Eastern maintains that Case's unilateral termination of the Dealer Agreement in June 2000 violated the Connecticut Franchise Act, Conn. Gen. Stat. § 42-133e et seq., the implied covenant of good faith and fair dealing, Conn. Gen. Stat. § 42a-1-203, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b. Case contends that all three of Eastern's claims fail as a matter of law. The court considers these arguments below.

I. Connecticut Franchise Act

In count one of its complaint, Eastern alleges that Case terminated the Dealer Agreement in violation of the Connecticut Franchise Act ("CFA"), Conn. Gen. Stat. § 42-133f, because it did so without "good cause." Case seeks summary judgment on this claim on the ground that Eastern cannot meet its burden of showing that a franchise relationship existed because (1) Eastern did not sell Case's products under a marketing plan that was prescribed in substantial part by Case, and (2) Eastern's business under such plan was not "substantially associated" with Case's logo. See Conn. Gen. Stat. § 42-133e(b). The court finds that even though Eastern has presented a genuine factual dispute that it operated under Case's marketing plan, it has failed to present any evidence that it was "substantially associated" with Case's trademark.

4

A. <u>Marketing Plan</u>

The primary issue in determining whether a marketing plan existed is the level of control that Case had over Eastern's operations. Indicia of control include the amount and degree of control that a putative franchisor had over a putative franchisee's (1) hours and days of operation; (2) advertising; (3) lighting; (4) employee uniforms; (5) prices; (6) sales quotas. Courts also consider whether the franchisor provided the franchisee with financial support, audited its books, or inspected its premises. <u>See, e.g.</u>, <u>Contractor's Home Appliance, Inc. v. Clarke Distrib. Corp.</u>, 196 F. Supp.2d 174, 177-78 (D. Conn. 2002) (citing cases). Still, there is no precise formula to determine the existence of a marketing plan and no one factor alone is dispositive. <u>See</u> <u>id.</u> at 177.

Here, drawing all reasonable inferences from the evidence in favor of Eastern, the court finds that a reasonable trier of fact could conclude that Eastern operated under a marketing plan that was substantially prescribed by Case. Section 16 of the Dealer Agreement between Eastern and Case, entitled "Records and Inspection," required Eastern to submit certified balance sheets and operating statements to Case within 90 days after the end of a fiscal year. <u>See</u> Def. App., Ex. B(3). That provision also required Eastern to maintain up-to-date sales, inventory, and warranty reports that Case could request at any time. Further, Case was allowed to inspect Eastern's facilities during business

5

hours and to examine its books and records.

Additionally, the record contains deposition testimony that as part of a dealer standards certification program sponsored by Case, Eastern used specific floor tiles and paint colors, utilized certain lighting, displayed Case logo signs, and exhibited Case pamphlets and other related paraphernalia. While Case argues that Eastern voluntarily participated in the program in order to receive certain financial incentives, that does not alter the fact that Eastern was adhering to a plan that was prescribed in substantial part by Case. See Contractors, 196 F. Supp.2d at 177 (citing Petereit v. S.B. Thomas, Inc., 853 F. Supp. 55, 60 (D. Conn. 1993)) (reasoning that the existence of a franchise relationship is fixed by the facts, not by what defendant or plaintiff call it), rev'd on other grounds, 63 F.3d 1169 (2d. Cir. 1995)). When taken together, these factors could lead a reasonable trier of fact to find that Eastern operated under a marketing plan that was prescribed in substantial part by Case.

B.  Substantial Association

Despite the court's findings regarding the existence of a marketing plan, Eastern fails to demonstrate the second prong of the statute's definition of a franchise -- that its business was "substantially associated" with Case's trademark. See Conn. Gen. Stat. § 42-133e(b)(2) (requiring a plaintiff to show that its business was "substantially associated" with a defendant's

trademark, service mark, tradename or logotype). While courts have not interpreted the CFA's "substantial association" clause as requiring exclusivity, that is, Eastern need not show that it only distributed Case products, see <u>Hartford Elec. Supply Co. v. Allen Bradley Co., Inc.</u>, 250 Conn. 334, 357-59 (1999), Eastern must demonstrate that it depended on the public's confidence in Case's products for "most or all" of its business. See <u>id.</u> at 361 (implicitly adopting the interpretation set forth in <u>Grand Light & Supply Co. v. Honeywell Inc.</u>, 771 F.2d 672, 677 (2d Cir. 1985)). Here, the record does not demonstrate such dependence, even when viewed most favorably to Eastern. To the contrary, the undisputed facts show that Case's products accounted for substantially less than fifty percent of Eastern's sales; that Eastern served as a distributor of comparable products in areas where it also represented Case; that Eastern's business of selling, renting, and repairing other manufacturer's equipment was not contingent on selling Case products; and that Eastern's use of the Case logo and corporate colors, while perhaps extensive, did not go beyond that of an authorized dealer.

    1.   <u>Percentage of Sales</u>

Eastern concedes that it carried many lines of construction equipment in addition to Case's. <u>See</u> Def. Loc. R. 9(c)(1) Stat. at ¶ 10. In the five years prior to Case's unilateral termination of the Dealer Agreement, Case's products accounted for an average of twenty-one percent of Eastern's total sales.

See Casler Aff., Pl. App., Ex. A at ¶ 12. While twenty-one percent is not a nominal portion of Eastern's business, it nevertheless falls short of "most or all" of its business. See Hartford Elec., 250 Conn. at 361. Even though the CFA does not explicitly state what percentage of a plaintiff's business is needed in order to find a "substantial association," all courts that have considered the matter have found such an association only where a defendant's products made up at least fifty percent of the plaintiff's overall business.[1] Compare id. (finding a "substantial association" where "termination of the parties' agreement would result in the plaintiff losing one half of its gross annual sales") with Grand Light, 771 F.2d at 678 (holding three percent of franchisee's business not sufficient to constitute a "substantial relationship"); and Contractors, 196 F. Supp.2d at 179 (finding no "substantial association" where plaintiff did not present any evidence to dispute defendant's evidence that its products "generally accounted for less than half of [plaintiff's] overall sales"); and Rudel, 68 F. Supp.2d

---

[1] Eastern implies that aside from sales of products, a significant part of its business comes from making warranty service repairs. See Def. Opp. at 21 ("the most profitable segments of [Eastern's] business are in the sale of parts . . . and in performing warranty work"). While the court notes that there is nothing in the case law that would have precluded Eastern from arguing that even though its sale of Case's products did not equal fifty percent of its total business, its warranty repair work did (assuming it could have provided sufficient evidence to do so), Eastern failed to make any such argument here.

at 126 (finding no association where defendant's products constituted no more than forty-one percent of plaintiff's overall business); and id. at n.17 (citing Hartford Elec., 250 Conn. at 361, for the proposition that fifty percent of sales is the threshold percentage); and Sorisio v. Lenox, Inc., 701 F. Supp. 950, 961 (D. Conn. 1988) (reasoning that plaintiff had not demonstrated that it depended on selling defendant's line of luggage because such sales constituted less than ten percent of plaintiff's total product purchases in a three-year period).

Further, the court finds it significant that the CFA was enacted to protect franchisees from financial ruin, not mere hardship or difficulty. See Grand Light, 771 F.2d at 677 (stating that the "clear purpose of the statute was to prevent a franchisor from taking unfair advantage of the relative economic weakness of the franchisee," and finding no "substantial association" because "[t]ermination, although harmful from [the plaintiff's] point of view, was not catastrophic"). The evidence in this case merely shows that Eastern was dependent on Case's products for only a portion of its business, i.e., twenty-one percent. Thus, although Case's termination may have to some extent financially damaged Eastern, it did not completely, or nearly, ruin its business.

    2.   <u>Eastern's Continued Viability</u>

Also, Eastern's continued survival, even after Case's termination of the Dealer Agreement, is further evidence that

Eastern did not rely on Case's products for most or all of its business. See, e.g., Rudel 68 F. Supp.2d at n.15 (finding it significant that plaintiff was still in business more than four years after the termination occurred). Indeed, as Eastern concedes, at least in dollar terms, Case's products were not its top-selling line. Compare Def. Loc. R. 9(c)(1) Stat. at ¶ 15 with Pl. Loc. R. 9(c)(1) Stat. at ¶ 15. The fact that Eastern required a capital infusion eight months after Case's termination -- beginning in February 2001 and lasting to February 2002 -- at best indicates financial hardship. This is especially so without evidence of a causal connection between Case's termination and Eastern's need to borrow $1.7 million nearly a year later. Thus, Eastern's need for a loan after termination of the Dealer Agreement cannot, without more, establish a "substantial association" with Case. See Chem-Tek, 816 F.Supp. at 129 (reasoning that termination must be disastrous, not just harmful).

    3.   Eastern's Use of Case's Logo

Further, Eastern fails to demonstrate that, as a result of its use of Case's logo, its business became synonymous with Case in the public's mind. See Contractors, 196 F. Supp.2d at 180 (finding it significant that there was no evidence to show that the public considered doing business with plaintiff the same as doing business with the defendant). It is undisputed that Eastern used an illuminated Case sign in front of its

headquarters, and displayed various plaques and awards, calendars, posters, and pamphlets -- all bearing the Case logo -- on its sales floor. But, Eastern's business cards used the Case logo along with many other manufacturers for which Eastern was an authorized dealer; no Eastern employee exclusively promoted Case products; and Eastern ran advertisements that either promoted Case's products with the products of other manufacturers or promoted only non-Case products. Also, Eastern did not use the Case logo on either its stationery or letterhead.[2] At best, Eastern's use of the Case logo demonstrates that Eastern utilized a great deal of Case's promotional material -- as any authorized dealer might do -- but falls short of showing that it held itself out as one and the same as Case, and that customers in the trade thought of it as such.

Accordingly, absent a genuine dispute as to any material fact, the court concludes as a matter of law that the Dealer Agreement between Eastern and Case did not constitute a franchise

---

[2] Where, as here, Eastern fails to meet what is clearly its primary burden of showing that Case's products accounted for at least fifty percent of its business, Eastern's use of Case's logo, by itself, is of very little, if any, probative value. To apply the remedial provisions of the CFA simply because Eastern hung up a few signs bearing the Case logo and installed a particular floor tile, without also requiring Eastern to demonstrate an economic dependence on Case's products, would constitute an undue and improper interference with mechanics of the free marketplace -- something neither party argues the CFA was meant to do. See Grand Light, 771 F.2d at 679; see also Hartford Elec., 250 Conn. at 361 (finding plaintiff's use of defendant's logo significant only because fifty percent of plaintiff's business was due to defendant's products).

under the CFA and therefore Case's motion for summary judgment on Eastern's claim for breach of the CFA is granted.[3]

II. Good Faith Covenant

Case also moves for summary judgment on count two of Eastern's complaint that alleges Case's termination of the Dealer Agreement constituted a material breach of the implied covenant of good faith and fair dealing.[4] Case maintains that this claim must fail because Eastern cannot meet its burden of showing that, as a matter of law, Case could not exercise the Agreement's at-will provision. The court agrees.

The at-will termination provided in section 13(a) of the Dealer Agreement states that Case could terminate the contract at any time and for any reason "upon ninety (90) days notice by [Case] to [Eastern]." It is undisputed that Case met this requirement by providing Eastern with 120 days' notice of termination. Nonetheless, Eastern alleges that Case's invocation

---

[3] Having found that the Dealer Agreement was not covered by the CFA, the court need not address whether Case had "good cause" to terminate the Agreement.

[4] Under Connecticut's version of the Uniform Commercial Code ("U.C.C."), a covenant of good faith is implied in the performance and enforcement of every contract. See Conn. Gen. Stat. § 42a-1-203. The statute's purpose is to enable a party to enforce contract terms in a manner that is consistent with the parties' reasonable expectations at the time of contracting. See Barclays Bus. Credit, Inc. v. Inter Urban Broad. of Cincinnati, Inc., No. 90 Civ. 2272, 1991 W.L. 258751, at *7 (S.D.N.Y. Nov. 27, 1991). On the other hand, a party is entitled to rely on the express terms of a contract, see Grand Light, 771 F.2d at 679, and thus the statute may not be used to override explicit contractual terms. See id.

of the termination clause violated the implied covenant of good faith and fair dealing.

Eastern fails to present any evidence that Case's termination was not proper within the express terms of the agreement. Even accepting Eastern's allegations as true -- that Case's termination was motivated by personal animus and that Case wanted to obtain larger dealers that could cover larger territories -- there was nothing improper about Case's action insofar as § 42a-1-203 is concerned. Motivation is irrelevant where there is no evidence that a contract, such as the Dealer Agreement here, was the product of special reliance or the result of unequal bargaining power. See Grand Light, 771 F.2d at 679 (citing Triangle Mining Co. v. Stauffer Chem. Co., 753 F.2d 734, 740 (9th Cir. 1985)) (holding that a clear termination provision renders the motive behind termination irrelevant where the record is absent evidence of special reliance or unequal bargaining power)).

Therefore, even when taken in the light most favorable to Eastern, the undisputed facts do not establish, that, as a matter of law, Case's termination was outside the explicit terms of the agreement and the parties' contractual expectations.

III. Connecticut Unfair Trade Practices Act

Although in count three of its complaint Eastern also alleges a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b, it concedes that if both

its CFA and covenant of good faith claims fail -- on which its CUTPA claim is predicated -- then the CUTPA claim must also fail. See Leisure Unlimtd., Inc. v. Depart. 56, Inc., Civ. No. 3:95cv2039, 1996 W.L. 684406, at *3 (D. Conn. May 3, 1996) (Nevas, J.); see also Rudel, 68 F. Supp.2d at 129 (reasoning that "an act authorized by a valid contractual provision does not constitute immoral, unscrupulous, oppressive or unethical behavior violative of the CUTPA rights of the contracting party"). Thus, having already awarded summary judgment to Case on counts one and two, summary judgment is appropriate as to this count as well.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [dkt. # 40.] is GRANTED. The Clerk is directed to enter judgment for the defendant and to close the case.

So ordered this 30 day of March, 2004, at Bridgeport, Connecticut.

_____
Alan H. Nevas
Senior United States District Judge